IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Gail L. Douda, | ) | C/A No.: 1:12-1664-RBH-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration,[1] | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Fed. R. Civ. P. 25(d), Carolyn W. Colvin is substituted for Commissioner Michael J. Astrue as the defendant in this lawsuit.

I.    Relevant Background

A.    Procedural History

On August 10, 2009, Plaintiff filed an application for SSI in which she alleged her disability began on June 1, 2005.  Tr. at 158–60.  Her application was denied initially and upon reconsideration.  Tr. at 72–73.  On August 10, 2011, Plaintiff had a hearing before Administrative Law Judge ("ALJ") William F. Pope.  Tr. at 24–71 (Hr'g Tr.).  The ALJ issued an unfavorable decision on August 30, 2011, finding that Plaintiff was not disabled within the meaning of the Act.  Tr. at 9–19.  Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  Tr. at 1–3.  Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on June 15, 2012.  [Entry #1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 47 years old at the time of the hearing.  Tr. at 27.  She completed the eighth grade.  Tr. at 28.  Her past relevant work ("PRW") was as a sandwich maker and a hospital janitor.  Tr. at 63–64.  She alleges she has been unable to work since June 1, 2005.  Tr. at 158.

2.    Medical History

On October 11, 2007, Plaintiff was seen at the Free Medical Clinic of Aiken County ("FMC") for high blood pressure and headaches.  Tr. at 389.  Plaintiff denied

chest pain and had no swelling in her extremities.  *Id.*  On June 12, 2008, Plaintiff complained of weekly migraines and had slight swelling in her ankles.  Tr. at 391.  On July 1, 2008, Plaintiff stated that she experienced nausea and vomiting one to two times per week.  Tr. at 393.  She also had headaches, cramps in her legs, and buzzing in her ears.  *Id.*  Her hypertension was noted to be well-controlled.  *Id.*  On September 11, 2008, Plaintiff complained of allergies and her physical examination was unremarkable.  Tr. at 270.  On October 9, 2008, Plaintiff stated that her headaches/migraines continued and she was given a trial of Imitrex.  Tr. at 269.  On December 16, 2008, Plaintiff stated that she was feeling better, but that Imitrex did not work.  Tr. at 268.  She reported a prior medical history of ovarian cysts, but exhibited no abdominal pain.  *Id.*  Her physical examination was unremarkable.  *Id.*  On March 17, 2009, Plaintiff was again seen for headaches.  Tr. at 267.

Plaintiff saw Lloyd Daniels, M.D., on April 6, 2009, and complained of pelvic pain.  Tr. at 251.  Dr. Daniels noted that Plaintiff had slight tenderness, left-sided pain, and a left ovarian cyst.  *Id.*  Dr. Daniels recommended an ultrasound, but Plaintiff was not able to pay for it.  Tr. at 267.

On June 25, 2009, Plaintiff returned to FMC complaining of headaches and pelvic pain that radiated to her back.  Tr. at 266.  The physician observed no edema and normal muscle strength bilaterally.  *Id.*  At this visit and future visits, the treating physician noted a history of hypertriglyceridemia and migraines.  Tr. at 262–66.  On August 3, 2009, Plaintiff had reached her blood pressure goal and was referred to the USC Aiken

Counseling Center for anxiety.  Tr. at 265.  On October 12, 2009, Plaintiff stated that her food was coming back up her throat and she had not had relief with Zantac.  Tr. at 264. She also reported right ankle pain, but exhibited normal muscle strength bilaterally.  *Id.*

On November 16, 2009, saw Susan Tankersley, M.D. for a consultative examination.  Tr. at 254.  Plaintiff reported a history of right leg and abdominal pain and that she was hard of hearing.  *Id.*  Plaintiff told Dr. Tankersley that her right leg pain was primarily at her ankle, but it was also present at the knee.  *Id.*  She stated that her whole leg distal to her knee was numb and that her ankle would swell if she stayed on her feet for more than five minutes.  *Id.*  Plaintiff also stated that she had polycystic ovarian disease and reported cysts large enough to impinge upon neural structures and cause some myofascial-type abdominal pain.  *Id.*  She stated that she had daily nausea and vomited two times per week.  Tr. at 255.  Plaintiff reported that she was hard of hearing and said she had rare low back pain.  *Id.*  She stated she had not had any recent episodes of SVT, but described having chest pain and shortness of breath every two weeks.  *Id.* Dr. Tankersley described this as a "stable frequency" and noted Plaintiff had not had a cardiovascular workup.  *Id.*  Plaintiff reported a longstanding history of migraine headaches, but Dr. Tankersley noted that following a workup 10 years prior, the neurologist diagnosed stress headaches.  Tr. at 256.  Plaintiff also described daily headaches that lasted all day.  *Id.*  Plaintiff stated that she did not have any problems with reading, but reported a long-term problem with anxiety.  *Id.*

4

On examination, Plaintiff demonstrated a mostly appropriate affect, fair communication skills, some speech fluency problems, and a mildly antalgic gait. *Id.* Dr. Tankersley observed that Plaintiff had some trouble understanding normal conversational-level volume and that her speech was dysarthric. *Id.* Plaintiff exhibited minimal tenderness over the right lower quadrant of her abdomen, normal strength and range of motion in her upper extremities, and occasional right upper extremity intention tremor. Tr. at 257. Dr Tankersley's impressions included chronic ankle and knee pain; hearing difficulty; polycystic ovarian disease; history of migraine, tension and probable rebound-type headaches; history of supraventricular tachycardia and hypertension; obesity; and an onset of intention tremor of the right upper extremity of uncertain etiology and significance. Tr. at 257–58.

X-rays of Plaintiff's right ankle and foot on December 1, 2009, revealed no acute abnormality. Tr. at 274.

On January 14, 2010, Plaintiff was seen at FMC for increased nausea, but reported that Nexium helped. Tr. at 263. The treating physician observed no edema. *Id.*

Plaintiff underwent an audiological evaluation on January 20, 2010, and was found to have mild to profound bilateral hearing loss. Tr. at 282. Binaural behind-the-ear hearing aids were recommended. *Id.*

On February 12, 2010, Plaintiff underwent a psychological evaluation with John C. Whitley III, Ph.D. Tr. at 283. Dr. Whitley indicated that he needed to raise his voice in order to be heard because Plaintiff's hearing was poor. Tr. at 284. Plaintiff reported

5

limited academic skills, poor sleep because of pain, migraines, depression, and anxious feelings.  *Id.*  Plaintiff was able to follow directions, organize her own schedule, bathe and dress on her own, do household chores, and manage her own finances.  Tr. at 284–85.  She reported that she was able to perform her own shopping, but she was felt anxious in crowds and had to flee public situations at times during the prior two years.  *Id.*  Dr. Whitley observed Plaintiff to have an appropriate gait and posture and to be in no pain and no significant distress.  Tr. at 285.  Plaintiff presented with mild depression and mild irritability, but no anxiety.  *Id.*  Her speech was mildly unclear and characterized by poor enunciation, although it could be understood.  *Id.*  Plaintiff could not recite serial 7s, she could not spell the word "world" backwards, she could not subtract 50 minus 37 or 11 minus 7.  *Id.*  Her concentration was grossly intact, her thought processing was concrete, and her abstract reasoning skills were within normal limits.  *Id.*  Dr. Whitley felt that Plaintiff's level of intelligence was in the borderline range and assigned her a GAF score of 59.  Tr. at 285–86.  He opined that she would be able to interact with others in a work setting, could make independent decisions, and would be able to use appropriate judgment.  Tr. at 286.  Dr. Whitley found that Plaintiff was experiencing mild depression and that her ability to maintain effort, focus, and pace for the timely completion of unskilled and simple tasks may be mildly impacted by her depression and her reported health issues.  *Id.*  He diagnosed depressive disorder secondary to medical issues.  *Id.*

On March 3, 2010, state-agency consultant Darla Mullaney, M.D., found Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds,

6

stand and/or walk at least two hours in an eight-hour workday, and sit for about six hours in an eight-hour workday.  Tr. at 296–303.  Dr. Mullaney opined that Plaintiff should never climb ladders, ropes, or scaffolds; and only occasionally climb ramps or stairs, stoop, kneel, crouch, and crawl.  Tr. at 298.  The doctor found that Plaintiff was limited in hearing and speaking and should avoid even moderate exposure to noise and concentrated exposure to hazards.  Tr. at 300.

On March 24, 2010, state-agency consultant Edward Waller, Ph.D., completed a Psychiatric Review Technique ("PRT") of Plaintiff.  Tr. at 304.  Dr. Waller estimated that Plaintiff had borderline intellectual functioning.  Tr. at 305.  He also concluded that Plaintiff had depression secondary to medical conditions and self-reported history of polysubstance abuse in remission.  Tr. at 307, 312.  Dr. Waller noted Plaintiff had mild restriction of activities of daily living ("ADLs"); mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  Tr. at 314.  Dr. Waller opined that Plaintiff's mental status would not preclude her from performing simple work tasks and that she would be able to sustain appropriate interaction with peers and co-workers without significant interference with her work.  Tr. at 316, 320.  He opined that Plaintiff was moderately limited in the ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically-based symptoms, and to perform at a consistent pace without an unreasonable number

7

and length of rest periods. Tr. at 318–19. Dr. Waller further opined that Plaintiff may miss an occasional workday due to depression. Tr. at 320.

On April 13, 2010, FMC referred Plaintiff for the cyst on her ovaries. Tr. at 262. She reported that she was still having migraines, muscle cramps in her legs, and nerve pain in the mornings. *Id.*

Teresa Smoak, a psychology trainee at the Psychology Clinic at the University of South Carolina Aiken, completed a psychological evaluation of Plaintiff on May 10, 2010, following a referral from Dr. Veronica Roberson. Tr. at 287–95. The evaluation was based on seven evaluation visits from November 13, 2009, through February 19, 2010. Tr. at 287. Plaintiff arrived to all visits on time and was cooperative, but had difficulty remembering significant events in her life and exhibited visibly anxious behavior such as sweating and shaky tone of voice. *Id.* Plaintiff reported that she was a really nervous person who did not like to leave home and sometimes had panic attacks when she went out. *Id.* She stated she felt down everyday, did not do anything enjoyable, and had difficulty sleeping. *Id.* Although Plaintiff reported almost daily depression and anxiety, she stated that she had never been diagnosed with or received treatment for depression or anxiety. Tr. at 288. She said that she had previously been prescribed Darvocet and Valium, but had not been able to afford those medications for two to three years. *Id.* She reported that her family members occasionally gave her their Valium and Zoloft and that the medications were helpful. *Id.* Plaintiff reported a prior history of alcohol and drug abuse. Tr. at 289. She stated she was unable to work because

8

she could not stand on her injured leg for more than 20 minutes before it would begin to swell.  Tr. at 290.

Plaintiff was administered the Beck Anxiety Inventory and the Beck Depression Inventory, which suggested that she was experiencing severe levels of anxiety and depression.  Tr. at 294.  Sections from the Anxiety Disorder Interview Schedule were administered and resulted in the following diagnoses: major depressive disorder, generalized anxiety disorder, panic disorder with agoraphobia, and specific phobia (driving in cars, heights).  Tr. at 294.  Plaintiff had problems related to her social environment, she did not graduate from high school, and her current GAF score was 55.  Tr. at 295.  Ms. Smoak suggested that Plaintiff receive cognitive behavioral therapy to help reduce her panic and agoraphobia symptoms, engage in behavioral activation to help reduce depressive symptoms, and receive training to reduce anxiety and help her better cope with pain.  *Id.*

On June 1, 2010, Plaintiff completed a headache questionnaire at the request of the Disability Determination Service.  Tr. at 205.  She reported daily headaches that never went away, but decreased in intensity with over-the-counter medications.  Tr. at 205–06.

On June 17, 2010, Ms. Smoak opined that Plaintiff had a good ability to maintain regular attendance (when transportation was available), sustain an ordinary routine without special supervision, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, and be aware of normal hazards and take appropriate

precautions; had a fair ability to remember work-like procedures, carry out very short and simple instructions, perform at a consistent pace without an unreasonable number and length of rest periods, respond appropriately to changes in a routine work setting, deal with normal work stress, interact appropriately with the general public, maintain socially appropriate behavior and travel in unfamiliar places; and a poor ability to maintain attention for a two-hour segment, complete a normal workday and workweek without interruptions from psychologically-based symptoms, understand and remember detailed instructions, carry out detailed instructions, and use public transportation. Tr. at 326–29. Ms. Smoak anticipated that Plaintiff would be absent from work more than four days per month due to her impairments or treatment. Tr. at 329.

In her discharge termination summary of Plaintiff dated July 8, 2010, Ms. Smoak noted that Plaintiff had been introduced to relaxation techniques designed to reduce anxiety, but had not found them to be helpful. Tr. at 322–23. Although Plaintiff had been told that she would need to practice the techniques to see a difference, she did not do the assigned relaxation homework. Tr. at 323. Plaintiff attempted to re-engage in activities that she enjoyed like reading magazines and listening to music, but reported difficulty reading a magazine because she was unable to concentrate. Tr. at 324. Ms. Smoak noted that during the sessions, Plaintiff had difficulty understanding directions and following through with them. Tr. at 325. She also had a difficult time consistently attending her sessions and missed some sessions due to not feeling well and to transportation difficulties. *Id.* Plaintiff was discharged because Ms. Smoak was not able

10

to continue seeing her and she did not want to be transferred to another therapist.  Tr. at 324.

On July 14, 2010, state agency consultant Robert Estock, M.D., completed a PRT for Plaintiff and recorded the same opinions as Dr. Waller.  Tr. at 357–70, 79–82.  On the same day, Robert H. Heilpern, M.D., completed a Physical Residual Functional Capacity ("RFC") Assessment and found Plaintiff to have the same physical limitations as cited by Dr. Mullaney.  Tr. at 371–78.

On July 27, 2010, Plaintiff reported to FMC complaining of daily migraines and problems sleeping.  Tr. at 394.  She was observed to have no swelling and normal muscle strength bilaterally.  *Id.*

On October 19, 2010, Plaintiff visited FMC complaining of numbness in the lateral side of her right thigh and shortness of breath with light exertion.  Tr. at 395.  Plaintiff denied gastrointestinal problems and exhibited normal muscle strength bilaterally.  *Id.*  X-rays dated December 13, 2010, revealed peripheral artery disesase and minor degenerative changes in the lumbar spine, but no acute osseous abnormality.  Tr. at 397–98.  On January 18, 2011, Plaintiff continued to complain of numbness in her right thigh and shortness of breath with overexertion.  Tr. at 396.  On September 10, 2011, Plaintiff complained of numbness in her hip and leg.  Tr. at 399.  She also reported a headache for two days accompanied by nausea and throbbing pain.  *Id.*  Plaintiff's problems were recorded as migraines and a new onset of Type II Diabetes.  *Id.*  She was given a new prescription for Imitrex.  *Id.*

11

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on August 10, 2011, Plaintiff testified that she lives with her sister and has been separated from her husband for 14 years.  Tr. at 28.  She reported that she had not had a valid driver's license since she was ticketed for a minor traffic violation in 2002 or 2003.  Tr. at 29–30.  She stated that she had been screened for hearing aids, but could not afford them.  Tr. at 36.

Plaintiff testified that she was unable to work because she had high blood pressure and peripheral artery disease ("PAD"), was diabetic, and took medications that made her dizzy almost every morning and caused her to vomit every couple of weeks.  Tr. at 37–38, 43.  She was unable to identify which medication made her dizzy and sick and noted that she was taking several different types of medication.  Tr. at 37, 39.  She stated that her dizziness caused her to fall and hurt her right ankle within six months or a year prior to the hearing.  Tr. at 46–47.  She reported no other side effects of her medications.  Tr. at 48.

Plaintiff stated that her PAD causes chronic back pain, constant numbness in her right leg, and intermittent numbness in her left foot.  Tr. at 49–50.  She testified that the numbness can cause her to fall.  Tr. at 50.  She stated that she has headaches every day and has a migraine headache once a month.  Tr. at 54–55.  She said that her daily

headaches improve with over-the-counter medications, but never go away completely. Tr. at 55–56. She testified that Imitrex does not help her headaches. Tr. at 56.

Plaintiff testified that the first thing she does in the morning is sit on a heating pad and prepare her medications. Tr. at 45. She stated that she has to sit on her heating pad for a couple of hours and spends most of her day sitting in her chair. Tr. at 50–51. She reported grocery shopping with her sister monthly. Tr. at 53. She stated that she could cook in the microwave, but that her sister cooked when it required using the stove or oven. Tr. at 58.

She reported that since a car accident approximately 10 years prior to the hearing, she has only been able to stand for 15 minutes at a time without pain. Tr. at 59–60. She stated that she could sit for about an hour without having to stand up because of her low back pain. Tr. at 61.

### b.    Vocational Expert Testimony

Vocational Expert ("VE") Adger Brown reviewed the record and testified at the hearing. Tr. at 62. The VE categorized Plaintiff's PRW as a sandwich maker as light or medium, unskilled work and as a hospital cleaner as medium, unskilled work. Tr. at 63–64. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform simple, routine tasks in a supervised environment; lift or carry no more than 20 pounds occasionally and 10 pounds frequently; stand and/or walk no more than two hours in an eight-hour workday; only occasionally stoop, twist, crouch, kneel, crawl, balance, and climb stairs or ramps; and never climb ladders or scaffolds. Tr. at 66. The

13

ALJ also limited the hypothetical individual to no more than a low level of hearing acuity and no exposure to unprotected heights or dangerous machinery. Tr. at 67–68. The VE testified that the hypothetical individual could not return to her PRW as defined by the Dictionary of Occupational Titles. Tr. at 68. The ALJ asked whether there were any other jobs in the region or national economy that the hypothetical person could perform. *Id.* The VE identified the following sedentary, unskilled jobs: packing and filling machine operators, assemblers, hand cutters, and parts packers. Tr. at 69. Upon questioning by Plaintiff's counsel, the VE stated that none of the jobs could accommodate a requirement that the individual stand up for 15 minutes out of every hour. Tr. at 70.

> 2.    The ALJ's Findings

In his August 30, 2011, decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since June 29, 2009, the application date (20 CFR 416.971 *et seq.*).
2. The claimant has the following severe impairments: right leg pain (residual effects of old tibia/fibula fractures), bilateral hearing loss, borderline intellectual functioning, depression, and obesity (20 CFR 416.920(c)).
3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a range of sedentary to light work as defined in 20 CFR 416.967(a) in that she can lift and carry up to twenty pounds occasionally and ten pounds frequently; stand and/or walk for no more than two hours in a workday; and sit throughout the workday. She can occasionally stoop, twist, crouch, kneel, crawl, balance, and climb

14

stairs or ramps, but never climb ladders, ropes, or scaffolds. She can do no work requiring more than a low level of hearing acuity and must avoid hazards such as unprotected heights and dangerous machinery. Her mental impairments further restrict her to simple, routine tasks in a supervised environment.

5.    The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.    The claimant was born on July 18, 1964, and was 44 years old, which is defined as a younger individual age 18–44, on the date the application was filed (20 CFR 416.963). She is now 47 years old.

7.    The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.    Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.    The claimant has not been under a disability, as defined in the Social Security Act, since June 29, 2009, the date the application was filed (20 CFR 416.920(g)).

Tr. at 11–19.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    The ALJ failed to adequately explain his findings regarding Plaintiff's RFC;

2)    The ALJ failed to provide a proper credibility analysis; and

3)    The ALJ erred in concluding that Plaintiff's headaches and anxiety disorder were not severe impairments.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

15

A.      Legal Framework

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured

for benefits, who are not of retirement age, who properly apply, and who are under a

"disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can be
> expected to result in death or which has lasted or can be expected to last for
> at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations

promulgated under the Act have reduced the statutory definition of disability to a series

of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983)

(discussing considerations and noting "need for efficiency" in considering disability

claims).  An examiner must consider the following:  (1) whether the claimant is engaged

in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[2] (4) whether such

---

[2]  The Commissioner's regulations include an extensive list of impairments ("the
Listings" or "Listed impairments") the Agency considers disabling without the need to
assess whether there are any jobs a claimant could do. The Agency considers the Listed
impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to
prevent all gainful activity.  20 C.F.R. § 416.925.  If the medical evidence shows a
claimant meets or equals all criteria of any of the Listed impairments for at least one year,
she will be found disabled without further assessment.  20 C.F.R. § 416.920(a)(4)(iii).  To
meet or equal one of these Listings, the claimant must establish that her impairments
match several specific criteria or be "at least equal in severity and duration to [those]

impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 416.920(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant

---

criteria." 20 C.F.R. § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 416.920(h).

can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for

18

the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

 B. Analysis

  1. Assessment of Plaintiff's Credibility

 Plaintiff argues that the ALJ's credibility analysis is not supported by substantial evidence, nor is it sufficiently specific to make clear the weight that the ALJ gave to her statements and the reasons for that weight. [Entry #14 at 24]. The Commissioner responds that the ALJ properly considered Plaintiff's subjective complaints and properly concluded that they were not credible to the extent alleged. [Entry #15 at 21].

 Prior to considering a claimant's subjective complaints, an ALJ must find a claimant has an underlying impairment that has been established by objective medical evidence that would reasonably be expected to cause subjective complaints of the severity and persistence alleged.[4] *See* 20 C.F.R. § 416.929; SSR 96-7p; *Craig*, 76 F.3d 585, 591–96 (4th Cir. 1996) (discussing the regulation-based two-part test for evaluating

---

[4] Although Plaintiff initially argued that the ALJ erred in not adequately analyzing whether her medically-determinable impairments could be expected to cause her alleged symptoms, she appears to have abandoned that argument in her reply brief. [Entry #26 at 26–28; Entry #29 at 1]. As was pointed out by the Commissioner, it is unclear why Plaintiff would challenge a finding that was favorable to her claim. [Entry #28 at 7].

pain).  The first part of the test "does not . . . entail a determination of the intensity, persistence, or functionally limiting effect of the claimant's asserted pain."  76 F.3d at 594 (internal quotation omitted).  Second, and only after claimant has satisfied the threshold inquiry, the ALJ is to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work."  *Id.* at 595.  This second step requires the ALJ to consider the record as a whole, including both objective and subjective evidence, and SSR 96-7p cautions that a claimant's "statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence."  SSR 96-7p, ¶ 4.

If an ALJ rejects a claimant's testimony about her pain or physical condition, he must explain the bases for such rejection to ensure that the decision is sufficiently supported by substantial evidence.  *Hatcher v. Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989).  "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p, ¶ 5.  In evaluating the intensity, persistence, and limiting effects of an individual's symptoms and the extent to which they limit an individual's ability to perform basic work activities, adjudicators are to consider all record evidence, which can include the following: the objective medical evidence; the individual's ADLs;

20

the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; any measures other than treatment the individual uses to relieve pain or other symptoms; and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  SSR 96-7p.

Here, after setting forth the applicable regulations, the ALJ considered Plaintiff's subjective claims under the required two-step process.  *See Craig*, 76 F.3d at 591–96. The ALJ found Plaintiff's impairments could reasonably be expected to cause some of the symptoms she alleged, but determined that Plaintiff's testimony "concerning the intensity, persistence and limiting effects" of her symptoms was "not credible to the extent" the testimony was inconsistent with the ALJ's determination of her RFC.  Tr. at 14.

In evaluating Plaintiff's credibility, the ALJ first noted that the clinical and diagnostic findings did not support the severity of her allegations.  Tr. at 16.  The ALJ then stated that, despite starting all of her medications at different times, Plaintiff was unable to identify which one caused her alleged dizziness.  *Id.*  He further stated that Plaintiff's testimony that she told her doctors about the dizziness was not confirmed by the medical records.  *Id.*  The ALJ noted that although Plaintiff described her need for

21

hearing aids and her inability to afford them, she was able to carry on a normal conversation during the hearing without any apparent difficulty. Tr. at 17. He stated that Plaintiff was not taking any medications for her headaches and testified that her headaches improve with over-the-counter medications. *Id.* Finally, the ALJ pointed out Plaintiff's ADLs, the "inconsistent information" she gave regarding why she no longer had a driver's license, and the disconnect between Plaintiff's alleged symptoms and the notes of her treating physicians. *Id.*

Plaintiff argues that the ALJ improperly relied on Plaintiff's testimony regarding her dizziness and the loss of her driver's license in discounting her credibility. [Entry #14 at 24–26]. She further argues that the ALJ's finding that she was able to carry on a conversation during the hearing without apparent difficulty is not true and that her hearing loss is supported by the record. *Id.* at 25. She also contends that her ability to engage in some limited ADLs is not indicative of her ability to engage in full-time work. [Entry #16 at 8].

The undersigned does not find reasonable the ALJ's reliance on Plaintiff's inability to identify which of her medications caused her alleged dizziness. The combination of Plaintiff's numerous medications, limited access to medical treatment, and borderline intellectual functioning render it plausible that Plaintiff would not be able to pinpoint which medication causes her to become dizzy. The ALJ also noted that Plaintiff testified that she has told her doctors about her dizziness, but that the treatment notes do not confirm that assertion. Tr. at 16. While this is technically accurate, the

22

undersigned finds that the ALJ's questioning on this issue was leading[5] and cursory such that Plaintiff's response should not be used to discount her credibility. Furthermore, Plaintiff testified that her doctor at FMC only had 15 minutes to see her every three months and she had issues other than her dizziness to address. Tr. at 40–41. For these reasons, the undersigned recommends disregarding the ALJ's reliance on Plaintiff's complaint of dizziness in discounting her credibility.

The undersigned likewise finds that it was unreasonable for the ALJ to discount Plaintiff's credibility based on her ability to testify at the hearing. The record includes numerous references to Plaintiff's hearing loss (Tr. at 254, 284), a test confirming mild to profound bilateral hearing loss (Tr. at 282), and a recommendation that she obtain hearing aids (Tr. at 282). Plaintiff's testimony regarding her hearing loss—that she had been screened for hearing aids, but could not afford them (Tr. at 36)—was consistent with the record. In addition, Plaintiff demonstrated some difficulty hearing the ALJ while being questioned, including four requests for repetition in the first six pages of the transcript before her hearing problem was discussed. *See* Tr. at 27, 29, 30, 31. Consequently, the undersigned concludes that to the extent the ALJ discounted Plaintiff's credibility based on her ability to answer questions during the hearing, he did so in error.

---

[5] The testimony on this issue is as follows:
> Q. And of course you told Dr. Robinson about [the dizziness], right?
> A. Oh, yes.

Tr. at 39.

In assessing Plaintiff's credibility, the ALJ also relied on what he perceived to be conflicting stories as to the reason she no longer had a driver's license.  Tr. at 17.  He noted that she testified that she lost her license as a result of a traffic ticket, but told Ms. Smoak that she chose not to renew her license because she felt she might hurt others with her driving.  *Id.*  Plaintiff contends there is no inconsistency between these statements because the issue of how she lost her license is separate from the issue of why she did not renew her license.  [Entry #14 at 26].  The Commissioner responds that even if such statements did not constitute a stark inconsistency, Plaintiff's testimony led to the ALJ's reasonable conclusion that Plaintiff was unable to drive rather than making the voluntary choice not to do so.  [Entry #15 at 24].  However, the ALJ did not attribute any significance to the reason behind Plaintiff not having a driver's license, rather he relied solely on the perceived inconsistencies in her story to discount her credibility.  The Commissioner appears to have conceded there was "no stark inconsistency" and the undersigned does not find any inconsistencies about this issue in the record.  Consequently, it was not reasonable for the ALJ to discount Plaintiff's credibility on this basis.

Finally, Plaintiff challenges the ALJ's reliance on her ADLs in assessing her credibility.  [Entry #16 at 7–8].  The ALJ found that despite Plaintiff's report of very limited capacity for activities, she testified that she is able to make her bed, wash dishes, cook meals using a microwave, and go grocery shopping with her sister.  Tr. at 17.  The ALJ noted that she also described a "much greater pattern of activities" to Dr. Whitley

24

during her consultative examination.  *Id.*  A review of Dr. Whitley's report reveals that Plaintiff informed him that she was able to follow directions, organize her own schedule, bathe and dress on her own, do household chores, and manage her own finances.  Tr. at 284–85.  The Commissioner argues that daily activities can suggest that an individual is not disabled.  [Entry #15 at 22].  Plaintiff asserts that her ADLs do not equal the demand of full-time work and that the ability to engage in some limited activity at her own pace is not proof of an ability to engage in substantial gainful activity.  [Entry #16 at 8]. Pursuant to SSR 96-7p, it is appropriate for an ALJ to consider a claimant's ADLs in assessing her credibility.  However, Plaintiff is likewise correct that evidence of her limited ADLs, on its own, is insufficient to establish her ability to engage in substantial gainful activity.  *See Higginbotham v. Califano*, 617 F.2d 1058, 1060 (4th Cir. 1980). For these reasons, the undersigned finds that the ALJ properly considered Plaintiff's ADLs, but that the limited nature of the ADLs is insufficient on its own to justify discounting Plaintiff's credibility.

Based on the foregoing, the strength of the ALJ's credibility assessment is significantly undermined.  Because most of the reasons advanced by the ALJ in discounting Plaintiff's credibility were not reasonable in light of the record, the undersigned concludes the ALJ's credibility determination is not supported by substantial evidence and is constrained to recommend that this case be remanded.  The undersigned further recommends that, on remand, the ALJ be directed to conduct his credibility analysis in accordance with SSR 96-7p.

2.     RFC Analysis

Plaintiff also argues that the ALJ erred in determining her RFC.  Specifically, she claims the ALJ erred in disregarding Ms. Smoak's opinion that she would be absent from work more than four days a month due to her impairments or treatments.  [Entry #14 at 17].  Plaintiff argues the ALJ further erred in failing to reconcile the RFC with Ms. Smoak's opinion that Plaintiff was seriously limited in her ability to maintain attention for a two-hour segment; understand, remember, and carry out detailed instructions; use public transportation; and complete a normal workday and workweek without interruptions from psychologically-based symptoms.  *Id.* at 18–19.  As a corollary to her RFC argument, Plaintiff argues the ALJ's hypothetical to the VE was incomplete because it included a restriction to simple tasks, but did not specifically address Plaintiff's deficiencies in concentration, persistence, and pace.  *Id.* at 19–22. The Commissioner argues that his RFC assessment was consistent with the opinions of Plaintiff's therapist and consulting doctor, the state-agency consultants, and Plaintiff's own statements. [Entry #15 at 20].

The ALJ's RFC assessment should be based on all the relevant evidence. 20 C.F.R. § 416.945(a).  Social Security Ruling 96-8p requires that the RFC assessment "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."     SSR 96–8p.     The RFC must "first identify the

individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . ." *Id.* The ALJ must discuss the claimant's ability to work in an ordinary work setting on a regular work schedule. *Id.*

Plaintiff's allegation of error rests primarily upon the opinion of Ms. Smoak, who opined that Plaintiff would be absent from work more than four days a month due to her impairments and found that Plaintiff had a poor ability to maintain concentration for a two-hour period and to complete a normal workday and workweek without interruptions from psychologically-based symptoms. According to Ms. Smoak's opinion, "poor" was defined as "seriously limited, but not precluded." Tr. at 326. The ALJ's discussion of Ms. Smoak's opinion is as follows:

> As for the opinion evidence, I note that Teresa Smoak, the claimant's former mental health therapist, prepared a medical source statement describing the claimant's mental limitations on June 17, 2010, which was apparently co-signed by Ms. Smoak's supervisors. That document was prepared soon after the claimant elected to terminate her therapy. The limitations described in that report would not appear to preclude work activity, but instead are consistent with the mental limitations in the residual functional capacity described above.

Tr. at 17 (internal citation omitted). The ALJ's conclusory finding regarding Ms. Smoak's medical source statement fails to address her opinion that Plaintiff would be absent from work for more than four days per month. Because this number of absences would likely preclude substantial gainful activity, the undersigned concludes that the ALJ erred in not addressing it and in stating that Ms. Smoak's opinion is consistent with the RFC assessment. For this reason, the undersigned recommends remand for the ALJ to

properly address Ms. Smoak's opinion.  In so recommending, the undersigned does not intend to suggest that Ms. Smoak's opinion must be accepted, rather that any rejection of the opinion be properly explained such that it is clear how the ALJ arrived at the RFC.

### 3.     Determination of Plaintiff's Severe Impairments

Plaintiff's final argument is that the ALJ erred in concluding that her headaches and anxiety disorder were non-severe impairments.  [Entry #14 at 27–30].  Because the undersigned recommends remand based on the ALJ's faulty credibility and RFC analyses, this allegation of error is not addressed in detail.  The undersigned notes, however, that a severe impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques.  A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms[.]"  20 C.F.R. § 416.908.  It is the claimant's burden to prove that she suffers from a medically-severe impairment.  *Bowen v. Yuckert*, 482 U.S. 137, 145 n.5 (1987).  Consequently, to the extent there is not a diagnosis of Plaintiff's conditions that is supported by objective medical evidence, such conditions would be properly found to be non-severe impairments.

## III.     Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law.  Based on the foregoing, the court cannot determine that the Commissioner's decision is

28

supported by substantial evidence.  Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

July 9, 2013                                    Shiva V. Hodges
Columbia, South Carolina                        United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).